1

2

3

4

5

6                    UNITED STATES DISTRICT COURT
                   WESTERN DISTRICT OF WASHINGTON
7                              AT SEATTLE

8   ULTIMATE TIMING, L.L.C., a Washington        Case No. C08-1632-MJP
    limited liability company; and ARASH KIA,
9   an individual,
                                                 **ORDER ON CROSS-MOTIONS FOR**
10                          Plaintiffs,           **PARTIAL SUMMARY JUDGMENT**

11  v.

12  DAVID SIMMS, an individual; SA
    INNOVATIONS, LLC d/b/a SAI TIMING &
13  TRACKING, a Michigan limited liability
    company,
14
                            Defendants.
15

16        This matter comes before the Court on cross-motions for partial summary judgment.

17  (Dkt. Nos. 110, 115.)  The Court has reviewed the motions, the responses (Dkt. Nos. 122,

18  127), the replies (Dkt. Nos. 134, 137), and the documents submitted in support thereof.  The

19  Court summarizes its rulings as follows:

20        1.  Neither party is entitled to summary judgment on Plaintiffs' claim for breach of the

21            oral joint venture agreement.

22        2.  Neither party is entitled to summary judgment on Plaintiffs' claim for breach of the

23            written nondisclosure agreement

24        3.  Neither party is entitled to summary judgment on Plaintiffs' claim for

25            misappropriation of trade secrets; however, as a matter of law, Plaintiffs had no

26            legally protectable trade secrets after the publication of the patent applications on July

ORDER - 1
(Case No. 2:08-CV-01632-MJP)

1    23, 2009.

2        4.  Plaintiffs' claim for conversion is dismissed as preempted.

3        5.  Defendants' Washington Securities Act counterclaim is dismissed because Simms's

4            investment was not a security.

5    The Court's reasoning follows.

6                                    **Background**

7    I.  Parties

8        Plaintiff Arash Kia ("Kia") has a Ph.D in electrical engineering and has, for the last

9    20 years, competed in triathlons throughout the Northwest.  (Kia Decl. ¶¶ 1-2.)  Kia formed

10   co-Plaintiff Ultimate Timing, LLC ("Ultimate"), a Washington limited liability company, to

11   develop and sell race timing chips.  (Baum Decl., Ex. 8.)  Defendant David Simms

12   ("Simms") is the founder and co-owner of Defendant SA Innovations ("SAI"); both

13   Defendants are Michigan residents.  (Simms Decl. ¶ 1.)

14   II.  Factual Background

15       During the winter of 2006-2007, Kia read about "ultra high frequency ('UHF') radio

16   frequency identification ('RFID') technology" and set out to design a timing system based on

17   the UHF RFID technology.   (Kia Decl. ¶ 4.)  Kia describes the timing system as follows:

18
19       The UHF RFID timing system that I subsequently designed uses Class 1 Gen
         2 UHF tags and ground antennas.  The ground antennas are placed at the start
20       and finish line of an athletic event where they activate "tags" worn by athletes
         on their shoes as the athlete passes over the antenna.  The activated tags,
21       which identify a specific athlete, are then "read" by the reader and recorded
         by software.

22   (Kia Decl. ¶ 5.)  Kia began testing his system, using antennas commercially available

23   through Impinj, but discovered the antennas on the market created blind spots that yielded

24   unacceptable read rates.  (Id. ¶ 6.)  Kia contacted ChampionChip, a race timing system

25   manufacturer, to gauge interest in his design.  (Id. ¶ 7; see also Simms Decl. ¶ 2.)   Defendant

26

ORDER - 2
(Case No. 2:08-CV-01632-MJP)

David Simms, acting on his own behalf and not ChampionChip's, responded and expressed interest in the timing system.  (Kia Decl. ¶¶ 7-8; Simms Decl. ¶¶ 2-3.)  The two met and, though some of the parameters of their agreement are in dispute, Simms agreed to provide at least some funding to Kia and Ultimate Timing to commercialize his timing system in exchange for a 20% ownership and profit interest in Ultimate Timing.  (Kia Decl. ¶ 8; Simms Decl. ¶ 5.)  The parties do not agree that Simms agreed to buy RFID timing systems and tags exclusively from Ultimate Timing.  (<u>Compare</u> Kia Decl. ¶ 8 <u>with</u> Simms Decl. ¶ 6.)

Either Kia or Simms contacted Tacit Solutions, Inc. to prepare the timing system for pilot races.  (Kia Decl. ¶ 9; Simms Decl. ¶ 9.)  In August 2007, the timing system was pilot tested at the Falmouth road race, though they had to use commercially-available Impinj antennas as opposed to specialized antennas.  (Kia Decl. ¶ 10.)  The system did not achieve viable read rates, but "[e]veryone involved … agreed that with additional development and testing" the product would be viable.  (<u>Id.</u>)  After November 17, 2007, the date of the Philadelphia Marathon, Kia alleges Tacit's principals became less responsive to Kia's communications.

In December 2007, the timing system malfunctioned while being used as the primary timing system at the Honolulu Marathon.  (Kia Decl. ¶ 13; Simms Decl. ¶ 11.)  Kia, Simms, and Tacit's relationship became increasingly "strained" following the failure in Honolulu. (Kia Decl. ¶ 13.)  Tacit soon demanded $200,000 for costs associated with developing the system and, Simms alleges, Kia directed Tacit to obtain payment from him.  (Simms Decl. ¶ 11.)  Simms states that in mid-January, Dan Howell of Tacit told him that "Tacit, not Kia, had developed and owned the timing system" and that they were going to form another company to develop and promote the system.  (<u>Id.</u> ¶ 12.)

On January 31, 2008, Kia and Simms met at Kia's home in Portland, Oregon to discuss the issues between Kia and Tacit.  (<u>Id.</u> ¶ 13.)  Kia asked Simms if he could record the conversation and Simms agreed, thinking Kia meant typing notes rather than creating an

audio recording.  (Kia Decl. ¶ 14, Simms Decl. ¶ 13; Baum Decl., Ex. 64 (partial transcript).)  In Kia's view, Simms "kept telling me that I should agree to give the technology ownership to Tacit and become a fifty percent partner in a new company that would sell the very same tags that my company Ultimate Timing was going to sell."  (Kia Decl. ¶ 14.)  Kia declined to start a new venture with Tacit and the parties' relationship deteriorated further.  (Simms Decl. ¶ 14.)  Simms soon agreed to promote a "ChronoTrack Timing System" with Tacit, in exchange for a state in the new company.  (Id. ¶ 14; Baum Decl., Ex. 69 (ChornoTrack entity report).)

Plaintiffs allege Simms and Tacit's ChronoTrack system is Kia's timing system.  Simms and Tacit used the timing system at the Los Angeles marathon on March 2, 2008.  (Baum Decl., Ex. 67 (article entitled "SAI Timing Performs in LA: Timing System Comes Back Strong After Honolulu Marathon Debacle").)  Kia states he has received no profits from sales of the ChronoTrack system.  (Kia Decl. ¶ 16.)

III. Summary of Claims

Plaintiffs advance the following causes of action: (1) breach of the oral joint venture agreement by Simms (Compl. ¶¶ 38-41); (2) breach of the written non-disclosure agreement by Simms (id. ¶¶ 42-45); (3) breach of fiduciary duty by Simms (id. ¶¶ 46- 49); (4) misappropriation of trade secrets in violation of RCW 19.108 by Simms and SAI (id. ¶¶ 50-57); (5) conversion (id. ¶¶ 58- 61); (6) unjust enrichment (id. ¶¶ 62-64); (7) accounting (id. ¶¶ 65-67); (8) knowingly providing substantial assistance in misappropriation in violation of Restatement § 876(b) (id. ¶¶68-71); and (9) acting in concert to misappropriate in violation of Restatement § 876(a) (id. ¶¶ 72-75).

Defendants filed the following Counterclaims: (1) breach of contract (Counterclaim ¶¶ 35-38); (2) breach of duty of good faith and fair dealing (id. ¶¶ 39-42); (3) unjust enrichment (id. ¶¶ 43-45); (4) conversion (id. ¶¶ 46-48); (5) accounting (¶¶ 49-51); (6) misrepresentation/fraud (id. ¶¶ 52-58); (7) violation of Washington's Securities Act, RCW

21.20, et seq. (id. ¶¶ 59-67); (8) declaratory judgment regarding the oral joint venture (id. ¶¶ 68-70); (9) declaratory judgment regarding the non-disclosure agreement (id. ¶¶ 71-73); (10) declaratory judgment regarding Simms's fiduciary duty (id. ¶¶ 74-76); and (11) declaratory judgment regarding the trade secrets (id. ¶¶ 77-79).

Plaintiffs move for summary judgment on their first (breach of oral joint venture agreement), second (breach of written contract), fourth (misappropriation of trade secrets) and fifth (conversion) claims. Plaintiffs also move for summary judgment on Defendants' seventh counterclaim for violation of the Washington Securities Act. (Dkt. No. 110 at 1.) Defendants move for summary judgment on Plaintiffs' first (breach of joint venture), second (breach of written contract), and fourth (misappropriation of trade secrets) claims and move to limit scope of Plaintiffs' damages. (Dkt. No. 115 at 4.)

**Discussion**

I.  Standard

"Summary judgment will not lie if . . . the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). Nor is summary judgment warranted if a material issue of fact exists for trial. Warren v. City of Carlsbad, 58 F.3d 439, 441 (9th Cir. 1995), cert. denied, 516 U.S. 1171 (1996). The underlying facts are viewed in the light most favorable to the party opposing the motion. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986). The party moving for summary judgment has the burden to show initially the absence of a genuine issue concerning any material fact. Adickes v. S.H. Kress & Co., 398 U.S. 144, 159 (1970). However, once the moving party has met its initial burden, the burden shifts to the nonmoving party to establish the existence of an issue of fact regarding an element essential to that party's case, and on which that party will bear the burden of proof at trial. Celotex Corp. v. Catrett, 477 U.S. 317, 323-24 (1986). To discharge this burden, the nonmoving party cannot rely on its pleadings, but instead must have evidence showing that

1    there is a genuine issue for trial.  Id. at 324.

2        II.  Breach of Oral Joint Venture Agrement

3        Both parties move for summary judgment on Plaintiffs' claim for breach of the

4    alleged oral joint venture agreement ("JVA").  (Dkt. No. 110 at 11; Dkt. No. 115 at 24.)  The

5    Court first addresses Plaintiffs' motion on the merits of the JVA claim and then Defendants'

6    motion seeking to limit damages on the JVA claim.

7            a.  Breach of the JVA

8        "The essential elements of a contract are the subject matter of the contract, the

9    parties, the promise, the terms and conditions, and (in some jurisdictions) the price or

10   consideration."  DePhillips v. Zolt Const. Co., 136 Wn.2d 26, 31 (1998) (quotations

11   omitted); see also Paulson v. Pierce County, 99 Wn.2d 645, 654 (1983) ("The essential

12   elements of a joint venture are (1) a contract, express or implied; (2) a common purpose; (3)

13   a community of interest; (4) an equal right to a voice, accompanied by an equal right to

14   control.").  Because oral contracts are "often, by their very nature, dependent upon an

15   understanding of the surrounding circumstances, the intent of the parties, and the credibility

16   of witnesses," summary judgment is frequently inappropriate in claims for breach.  Garbell v.

17   Tall's Travel Shop, 17 Wn. App. 352, 353 (1977).

18       Plaintiffs' describe the exchange as follows: "Simms agreed to fund the development

19   of Kia's timing system, to market the timing system to his fellow timers, to purchase timing

20   systems and tags only from Ultimate Timing and to give Kia fifty percent of SAI's timing

21   revenues, in exchange for Simms' receiving twenty percent of the profits of Ultimate…."

22   (Dkt. No. 110 at 11-12; Kia Decl. ¶ 8.)  On the record before the Court, summary judgment

23   is inappropriate on this claim.

24       First, Plaintiffs have not met their initial burden of presenting unambiguous evidence

25   on every element of their claim.  Plaintiffs rely primarily on their own understanding of the

26   joint venture when presenting evidence of the existence of the agreement.  (See Baum Decl.,

ORDER - 6
(Case No. 2:08-CV-01632-MJP)

1   Ex. 1 (Kia Dep.) at 298:20-299:09; Ex. 3 (UT Dep.) 96:22-97:23, 107:12-23; Kia Decl. ¶ 8.)

2   Plaintiffs further rely on a statement Simms made at a deposition, but the statement is

3   ambiguous.  When asked, in essence, whether the joint venture contemplated Simms

4   providing the capital while Kia provided the innovation, Simms responded: "Yes, that's what

5   we were discussing."  (Baum Decl., Ex. 4 (Simms Dep.) at 299:22-300:06.)  Reading the

6   evidence in the light most favorable to the non-movant, this statement does not demonstrate a

7   meeting of the minds.  (Dkt. No. 127 at 11.)

8       Second, there are material disputes of fact regarding the terms and conditions of the

9   JVA.  The parties dispute Simms' obligation to fund the development of the new timing

10  system.  (Compare Supp. Baum Decl., Ex. 6 (Kia Dep.) at 298:20-299:09 (Kia stating Simms

11  agreed to fund the development) with Simms Decl. ¶ 5 (Simms stating his funding would be

12  limited to $300,000).)  Kia and Simms disagree about the extent of Simms' marketing

13  obligations.  (Compare Supp. Baum Decl., Ex. 6 (Kia Dep.) at 304:12-18 (Simms agreed to

14  market to race directors and timers) with Simms Decl. ¶ 5 (no specific marketing

15  obligations).)  They also dispute Simms' obligation to purchase timing systems and tags

16  exclusively from Ultimate Timing.  (Compare Kia Decl. ¶ 8 with Simms Decl. ¶ 6.)  These

17  disputes of fact are material given Plaintiffs' formulation of the breach.  (See Dkt. No. 134 at

18  3.)  Specifically, Plaintiffs allege Simms breached when he joined forces with Tacit and then

19  promoted the new timing system on Tacit's behalf.  (Id. at 3-4; Baum Decl., Exs. 65-66

20  (Simms-Tacit discussions) and 66-67 (Chronotrack marketing).)  If, as Simms asserts, he had

21  no specific marketing obligations to Ultimate, he may not be in breach by promoting

22  ChronoTrack.  This dispute is particularly material when the alleged JVA had no specific end

23  date.  (Fisher Decl., Ex. 20 (Kia Dep.) at 305:23-306:07.)  The question of whether Simms

24  breached turns on the terms of the underlying agreement.

25      Plaintiffs are not entitled to summary judgment on their claim for breach of the JVA.

26  \\

ORDER - 7
(Case No. 2:08-CV-01632-MJP)

b.   JVA Damages

Defendants argue that Plaintiffs' damages on the JVA claim are limited as a matter of law by Kia's termination of the agreement on April 25, 2008.  (Dkt. No. 115 at 24.) Defendants cite Ford v. Trendwest Resorts, Inc. for the proposition that, where contracts are unilaterally terminable, parties are only entitled to damages up to termination.  146 Wn.2d 146, 157 (2002).  Ford is inapplicable to the matter at hand because that court held "lost earnings cannot measure damages for the breach of an employment at-will contract because the parties to such a contract do not bargain for future earnings."  Id.  In contrast, the parties here may have bargained for future earnings in the form of ownership stakes in various entities.  Even if the Court were to accept Ford's applicability in this context, the terms of the demand letter do not address a termination of the parties' relationship.  (See Fisher Decl., Ex. 11 ("Mr. Kia has elected not to file immediate legal action and instead has elected to give you the opportunity to abide by the terms of your agreements.").)

Defendants further assert that Kia cannot recoup lost profits beyond the April 25, 2008 letter because they would be too speculative.  When a performance contract does not contain a term of duration, courts construe it as "terminable-at-will by either party after a reasonable time."  Cascade Auto Glass, Inc. v. Progressive Cas. Ins. Co., 135 Wn. App. 760, 766 (2006).  "Whether notice is reasonable depends on the facts and circumstances of each case" and is generally an issue for the jury.  Id. at 766-67.  Further, under "new business rule," lost profits are permissible damages under a claim for breach when "a reasonable estimation of damages can be made based on an analysis of the profits of identical or similar businesses operating under substantially the same market conditions."  No Ka Oi Corp. v. National 60 Minute Tune, Inc., 71 Wn. App. 844, 849 (1993). Defendants simply overstate the reach of the "new business" limitation for the recovery of lost profits.  No Ka Oi does not preclude lost profits damages for new businesses entirely, it merely analyzes the type of evidence that a party must put forth in order to pursue the damages.  The Court has not been

1    asked to test the reasonableness of Plaintiffs' damage estimate.

2            Defendants are not entitled to summary judgment limited JVA damages.

3        III. Breach of Written Nondisclosure Agreement

4            Plaintiffs and Defendants move for summary judgment on Plaintiffs' claim for breach

5    of the written non-disclosure agreement ("NDA").  (Dkt. No. 110 at 16; Dkt. No. 115 at 20.)

6    The Court first addresses whether either party is entitled to summary judgment on the issue

7    of the validity of the NDA, then turns to the issue of breach.

8            a.   Length of Offer

9            Defendants seek to dismiss Plaintiffs' NDA claim on the basis that Kia did not sign

10   the NDA until the parties' relationship had ended.  Unless an offer to form a contract states

11   how long it is open, it is only open for a reasonable time.  Sherrod ex rel. Cantone v. Kidd,

12   138 Wn. App. 73, 75-76 (2007) (citing Restatement (Second) Contracts § 41).  Though

13   reasonableness is generally a question of fact, the Court can decide the "limits of a

14   reasonable time" if the facts are undisputed that the acceptance arose occurred after the

15   purpose of the contract could no longer be attained.  Id. at 76.

16           The NDA provides that "[t]he term of this Agreement shall commence on the date

17   that this Agreement is signed by both Parties and shall terminate five years after the last date

18   on which any Confidential Information is disclosed under this Agreement."  (Fisher Decl.,

19   Ex. 9 ¶ 5.)  Simms signed the NDA on June 17, 2007 and filled out the portion at the top of

20   the contract with his information.  (Id.)  The copy submitted by Kia as a "true and correct"

21   version of the NDA with the Complaint does not contain Kia's signature.  (Compl. ¶ 21, Ex.

22   A.)  During discovery, Plaintiffs produced a copy of the NDA with Kia's signature, dated

23   February 16, 2008.[1]  (Fisher Decl., Ex. 10.)

24   _____

25           [1] Plaintiffs suggest that the date on the top of the agreement controls because the
     contract provides "the Parties have executed this Agreement on the date first written above,"
     which is June 17, 2007.  (Dkt. No. 122 at 19.)  This argument ignores the fact that the

26   Agreement was not executed without Kia's signature.

1    Plaintiffs assert that Simms waived Kia's signature requirement by receiving

2  "confidential information" within the ambit of the contract.  This is at odds with Kia's own

3  understanding that the agreement would commence when both parties signed it.  (Fisher

4  Decl., Ex. 20 (Kia Dep.) at 273:06-274:02.)  The record does not support the assertion

5  Simms waived the signature requirement.

6    Defendants ask the Court to rule that the contract is ineffective because Kia signed it

7  after the purpose of the contract had been frustrated.  By February 16, 2008, the joint venture

8  was in peril.  (Id. at 266:21-22 ("By then it was obvious that Mr. Simms was not going to

9  fulfill his obligations to the joint venture…").)  While the deterioration of the parties'

10  relationship may impede some purposes of the NDA, there other reasons may have existed to

11  execute the contract.  For instance, the contract includes a term limiting Simms' ability to

12  pursue "the development, sale, or purchase of an athletic timing system based on Class 1 Gen

13  2 RFID tags" without Ultimate Timing's consent.  (Fisher Decl., Ex. 9 ¶ 10.)  Thus, there are

14  issues of fact as to whether Kia signed the contact within a reasonable amount of time and

15  Defendants' motion on this issue is denied.

16    b.  Accuracy of Feb. 16, 2008 Signature

17    Defendants also question whether Kia actually signed the NDA on February 16,

18  2008; these questions preclude summary judgment in Plaintiffs' favor.  (Dkt. No. 127 at 15-

19  16.)  Kia's April 2008 cease and desist letter does not mention the fact that Kia signed the

20  NDA in February 2008.  (Fisher  Decl., Ex. 11.)  The copy of the NDA originally provided to

21  Simms' counsel did not include Kia's signature.  Plaintiffs also did not provide the signed

22  NDA in response to a document request for the NDA referenced in the Complaint.  (Supp.

23  Fisher Decl., Ex. D (RFP # 31).)  When Mr. Wright referenced the signed NDA during a

24  deposition, he began by asking Mr. Fisher for a "copy of the fully signed and executed NDA

25  that was provided to him."  (Supp. Fisher Decl., Ex. E (Rahimi Dep.) at 316:24-317:03.)

26  Fisher told Wright he did not have a copy and asked Mr. Wright if he had one, and then

ORDER - 10
(Case No. 2:08-CV-01632-MJP)

1    Wright conceded he had a signed copy of the agreement.  Mr. Fisher asked why it wasn't

2    produced.  Mr. Wright first responded "Because it wasn't asked for."  (Id. at 318:02).)  When

3    Mr. Fisher asked "What do you mean, it wasn't asked for?," Mr. Wright responded, "I'm not

4    withholding a copy of an agreement.  It's come to my attention in the last 24 hours, that it

5    was signed and sent to your client on February 16th of 2008."  (Id.)

6            Defendants thus question the veracity of Kia's assertion he signed the contract on

7    February 16.  (Dkt. No. 127 at 16.)  The circumstances surrounding the disclosure of the

8    NDA create a dispute of fact regarding the validity of the NDA.  The jury will have to

9    evaluate Kia's credibility in his representations regarding signing the NDA.  Plaintiffs are

10   therefore not entitled to summary judgment on their NDA claim because material issues of

11   fact exist regarding the effectiveness of the contract.

12                   c.   Breach of the NDA

13           Defendants move for summary judgment claiming Simms did not disclose any

14   confidential information in violation of the NDA.  Disclosure is not, however, the only

15   possible method of breach.  The NDA, if effective, prohibited Simms from (1) disclosing

16   confidential information and (2) developing or purchasing an athletic timing system based on

17   Class 1 Gen 2 RFID tags.  (Fisher Decl., Ex. 9 ¶¶ 2, 10.)

18           Plaintiffs assert Defendants violated the NDA by promoting and marketing the

19   "ChronoTrack Timing System" and by using the ChronoTrack system in his own races.

20   (Dkt. No. 110 at 17.)  Tacit engaged Simms to market a system that cured the defects that

21   arose in Honolulu and that Simms has a 22 percent ownership in ChronoTrack.  (Baum

22   Decl., Ex. 5 (Howell Dep.) at 121:05-11 (Tacit and Simms discuss forming a new company

23   to promote the ChronoTrack system).)  Simms disputes the alleged breach of the NDA,

24   claiming he did not develop or directly sell ChronoTrack, but this is a dispute of fact that

25   must be settled by a jury.  (Simms Decl. ¶ 14.)  Material issues of fact preclude summary

26   judgment in Defendants' favor on Plaintiffs' claim for breach of the NDA.

ORDER - 11
(Case No. 2:08-CV-01632-MJP)

1          d.  NDA's Purported Non-compete Provision

2          Finally, Defendants seek dismissal of the NDA claim arguing the contract is a

3   covenant not to compete that is invalid as a matter of law.  (Dkt. No. 127 at 18.)  Defendants

4   rely on caselaw analyzing non-compete covenants in employment contracts.  (See id. (citing

5   Wood v. May, 73 Wn.2d 307 (1968) (horseshoe employee).)  The NDA is, however, not an

6   employment contract.  It contemplates a much more complex role for Simms and Simmco

7   Data Systems: "Simmco Data Systems and its associates operating as investors, partner

8   companies, value added resellers, and race directors agree to exclusive purchase athletic

9   event systems based on Class 1 Gen 2 RFID tags from Ultimate Timing …."  (Baum Decl.,

10  Ex. 24 ¶ 10.)  Because the NDA is not an employment contract, the Court declines to dismiss

11  the NDA claim based on Defendants' non-compete clause arguments.

12         Material issues of fact preclude summary judgment as to either the effectiveness of

13  the NDA or the existence of a breach.

14  IV.  Misappropriation of Trade Secrets

15         Plaintiffs and Defendants move for summary judgment on Plaintiffs' fourth claim for

16  misappropriation of trade secrets.  Washington's Uniform Trade Secrets Act, RCW

17  19.108.030(1), provides a "complainant may recover damages for the actual loss caused by

18  misappropriation" of trade secrets.  The statute defines "misappropriation" as:

19         (a) Acquisition of a trade secret of another by a person who knows or has
           reason to know that the trade secret was acquired by improper means; or
20         (b) Disclosure or use of a trade secret of another without express or implied
           consent by a person who:
21                  (i) Used improper means to acquire knowledge of the trade secret; or
                    (ii) At the time of disclosure or use, knew or had reason to know that
22         his or her knowledge of the trade secret was (A) derived from or through a
           person who had utilized improper means to acquire it, (B) acquired under
23         circumstances giving rise to a duty to maintain its secrecy or limit its use, or
           (C) derived from or through a person who owed a duty to the person seeking
24         relief to maintain its secrecy or limit its use; or
                    (iii) Before a material change of his or her position, knew or had
25         reason to know that it was a trade secret and that knowledge of it had been
26

ORDER - 12
(Case No. 2:08-CV-01632-MJP)

acquired by accident or mistake.

RCW 19.108.010(2).  Plaintiffs asserting a trade secrets claim bear the burden of proving "that legally protectable secrets exist."  Boeing Co. v. Sierracin Corp., 108 Wn.2d 38, 50 (1987).  The Court must consider (1) whether there is an identifiable trade secret at issue that is not readily ascertainable; (2) whether Plaintiffs made reasonable attempts to preserve the trade secret; and (3) whether Defendants misappropriated or used the trade secret.

      a.  Trade Secret

Washington's UTSA defines "trade secret" as:

> … information, including a formula, pattern, compilation, program, device, method, technique, or process that:
> (a) Derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use; and
> (b) Is the subject of efforts that are reasonable under the circumstances to maintain its secrecy.

RCW 19.18.010(4); see also Boeing, 108 Wn.2d at 49-50.  Trade secrets "frequently contain elements that by themselves may be in the public domain but together qualify as trade secrets.  Boeing, 108 Wn.2d at 50; see also Machen, Inc. v. Aircraft Design, Inc., 65 Wn. App. 319, 327 (1992) (considering multiple elements together as one concept) overruled on other grounds by Waterjet Technology, Inc. v. Flow Intern. Corp. 140 Wn.2d 313 (2000).

During discovery, the Court granted Defendants' motion to compel and directed Plaintiffs "provide specific and complete answers to Defendants Interrogatory Nos. 8, 13, 14, and 15, including without limitation identifying with specificity the trade secrets and confidential information that Plaintiffs allege Defendants misappropriated."  (Dkt. No. 71; see also Fisher Decl., Ex. 12 (response upon Court's Order).)  Defendants summarize the response as including the following elements: (1) using Class 1 Gen 2 UHF tags for RFID system; (2) encoding bib numbers into tag memory; (3) encoding tags such that the first 10 digits of the 96-bit EPC code in the tags were the same as the bib numbers, with the

1   remaining digits made into trailing zeros; (4) attaching tags on bibs with mild adhesive,

2   which could then be peeled off and attached to runners' shoes; (5) ground field antenna that

3   radiates in a pattern that concentrates field in runners' path of travel; and (6) Determination

4   that it was necessary to use two antenna lines in close proximity to reach industry-acceptable

5   read rates.  (Dkt. No. 115 at 11.)  Plaintiffs summarize the trade secret as a "unique

6   combination of UHF Class 1 Gen 2 RFID tags, with proper reader and antenna

7   specifications, configurations, and software code, all housed in a portable, waterproof

8   battery-operated controller box."  (Dkt. No. 110 at 18; see also Dkt. No. 122 at 4-5 ("Kia's

9   particular recipe of specialized features within custom antennas, readers, encoded

10  read/writable tags, and overall process that establish the uniqueness of Kia's timing

11  system.").)

12         Neither party is entitled to summary judgment on the issue of the existence of a trade

13  secret because there are material disputes about whether the timing system was readily

14  ascertainable.  On one hand, Plaintiffs cite to Simms' statement that, in the fall of 2007, there

15  was no other timing system like Kia's system.  (Baum Decl., Ex. 4 (Simms Dep.) at 184:25-

16  185:09.)  They further reference statements from other individuals in the industry extolling

17  the virtues of certain elements of the timing system.  (See, e.g., Baum Decl., Ex. 2

18  (Magnusson Dep.) at 39:03-40:09.)  This may be some evidence that the timing system

19  derives an independent economic value and not generally known.   On the other hand,

20  Defendants have submitted evidence that a number of elements that drive the value of the

21  timing system were generally known or ascertainable.  (See Fisher Decl., Ex. 22

22  (Hansen/ITS Dep.) at 38:17-39:05 (DAG system using disposable encoded tags with bib

23  numbers on bibs); Ex. 23 (Lockwood/Ipico Dep.) at 38:12-42:13 (RFID tags removed from

24  bibs and attached to shoes).)   The statements of those individuals extolling the purported

25  novelty of the Kia systems are in tension with those statements describing the commonplace

26  nature of the technology.  A trier of fact must therefore determine whether Kia's system

1    possessed independent economic value and was not readily ascertainable.

2            b.    Reasonable efforts/Disclosure to others

3            To preserve trade secret protection, an owner must make reasonable efforts under the

4    circumstances to maintain secrecy.  RCW 19.18.010(4).  Whether an owner's precautions are

5    reasonable is generally a question of fact.  Rockwell Graphic Systems, Inc. v. DEV

6    Industries, Inc., 925 F.2d 174, 179 (7th Cir. 1991) ("… only in an extreme case can what is a

7    'reasonable' precaution be determined on a motion for summary judgment, because the

8    answer depends on a balancing of costs and benefits that will vary from case to case and so

9    require estimation and measurement by persons knowledgeable in the particular field of

10   endeavor involved.").  Defendants argue Plaintiffs have failed to take reasonable efforts to

11   maintain secrecy because (1) they disclosed the idea to others while developing the product

12   and (2) they disclosed the idea in the patent application.

13                    i.  Disclosure to Others

14           Defendants describe, in great detail, the disclosures made to others that weigh against

15   the existence of a protectable trade secret.  (Dkt. No. 115 at 11-13.)  These disclosures do

16   not, however, entitle Defendants to summary judgment.

17           First, Defendants do not point any disclosures of the whole timing system.  (See Dkt.

18   No. 137.)  Nor do Plaintiffs cite any disclosure of the sixth element of Kia's purported secret:

19   the use of two antenna lines in close proximity.  (See Dkt. No. 115 at 13.)  This is critical,

20   since elements of a trade secret protection can arise over an aggregation of ideas.  See

21   Boeing, 108 Wn.2d at 50.  Second, there are material issues of fact concerning Plaintiffs'

22   attempts to preserve the confidentiality of the information he did provide.  For instance, Kia

23   states that, although he did not have a signed NDA with Winning Time, he did email them a

24   request to keep the presentation confidential.  (Supp. Baum Decl., Ex. 86 (Kia Dep.) at 274.)

25   Whether these efforts were reasonable is a question of fact that would be improper for this

26   Court to decide on summary judgment.  See Rockwell Graphic Systems, 925 F.2d at 179.

1    Thus, there are issues of fact as to whether Kia's efforts to maintain secrecy were

2    reasonable.

3        ii.   Patent Application

4    Plaintiffs are not entitled to trade secret protection for the time period after the timing

5    system was disclosed when Kia's patent applications were published.  "Matter which prior to

6    a patent grant might have been subject to protection as a trade secret is deemed disclosed to

7    the extent that it is described in the patent."  1 Roger M. Milgrim & Eric E. Bensen, Milgrim

8    on Trade Secrets § 1.06[1] (collecting cases); see also BondPro Corp. v. Siemens Power

9    Generation, Inc., 463 F.3d 702, 707 (7th Cir. 2006) ("Publication in patent destroys the trade

10   secret … because patents are intended to be widely disclosed—that is the quid for the quo of

11   the patentee's exclusive right to make and sell the patented device.").  Defendants argue

12   Kia's trade secrets, to the extent they exist, were extinguished upon publication of the patent

13   applications.  Kia concedes his trade secrets are disclosed in the patent applications.  (Fisher

14   Decl., Ex. 20 (Kia Dep.) at 321:09-322:11.)  The patent applications were published on

15   December 25, 2008 and July 23, 2009.  (Fisher Decl., Exs. 17-18.)  Thus, Plaintiffs have no

16   protectable trade secrets after July 23, 2009.

17   The publication of the patents does not, as Defendants' suggest, limit Plaintiffs'

18   potential damages to those suffered before July 23, 2009.  If they prevail on their claim,

19   Plaintiffs may be entitled to relief for an unfair "head start" Defendants gained through the

20   misappropriation.  See, e.g., Lamb-Weston, Inc. v. McCain Foods, Ltd., 941 F.2d 970, 974

21   (9th Cir. 1991) (head start discussed in the context of injunctive relief).   Defendants' motion

22   does not ask the Court to conclusively determine the length of a potential head start period.

23        c.   Misappropriation

24   To prevail on a claim for misappropriation of trade secrets, a plaintiff must also

25   demonstrate disclosure or use of the purported secret.  RCW 19.108.010(2).  Here, too,

26   material issues of fact preclude summary judgment.  During their conversation on January

ORDER - 16
(Case No. 2:08-CV-01632-MJP)

31, 2008, Simms suggests any timing system developed by Tacit would involve Kia's ideas:

> Kia: [Tacit's] not a timing company.  They're an RFID engineering company.  We give them credit for that and we respect that and let them—let their name get out there that anyone wants to develop an RFID based system, it's them.  The concept of timing using this particular tact—
>
> Simms: It came from you and UT.
>
> Kia: And that's all we want.  We're not saying anything else.  They're taking credit for that.  The system that gets developed should not have their brand name on it….

(Baum Decl., Ex. 64 at 90:17-91:08.)  Simms' testimony suggests some portion of the ChronoTrack system derives from Kia's technology:

> Q: You are currently working with and subject to an agreement whereby you will become a part owner of ChronoTrack, which … Tacit … formed, based upon the technology that you and Mr. Kia co-developed and worked on throughout the Fall of 2007.  You have decided to join them rather than stay with Mr. Kia?
>
> A [Simms]: That is correct.

(Baum Decl., Ex. 7 (SAI Dep.) at 325:22-326:03.)  In contrast, Tacit insists they owned the timing system and, thus, there could be no misappropriation.  (Supp. Fisher Decl., Ex. K (Howell Dep.) at 57:03-58:05.)  There are issues of fact as to whether Simms used Kia's trade secret in pursuit of the ChronoTrack.  The Court cannot decide the issue of disclosure or use as a matter of law.

In sum, material issues of fact pervade Plaintiffs' claim for misappropriation of trade secrets and neither party is entitled to summary judgment on the issue.

V.  <u>Conversion</u>

Conversion is "the act of willfully interfering with any chattel, without lawful justification, whereby any person entitled thereto is deprived the possession of it."  <u>Westview Investments, Inc. v. U.S. Bank Nat. Ass'n</u>, 133 Wn. App. 835, 852 (2006) (quotations omitted).  Defendants insist the conversion claim is preempted by the WUTSA.  The Act

provides that it "displaces conflicting tort, restitutionary, and other law of this state pertaining to civil liability for misappropriation of trade secret."  RCW 19.108.900(1); see also RCW 19.108.900(2)(a) (noting the displacement does not affect civil liability that is not based on trade secret misappropriation).

"A plaintiff may not rely on acts that constitute trade secret misappropriation to support other causes of action." Thola v. Henschell, 140 Wn. App. 70, 82 (2007) (quotations omitted).  To determine whether the UTSA preempts a common law claim, the court must "(1) assess the facts that support the plaintiff's civil claim; (2) ask whether those facts are the same as those that support the plaintiff's UTSA claim; and (3) hold that the UTSA preempts liability on the civil claim unless the common law claim is factually independent from the UTSA claim." Id.  Plaintiffs concede their conversion claim is simply an alternative to their misappropriation claim.  (Dkt. No. 134 at 8-9.)  In their motion, Plaintiffs identify both the "chattel" at issue and the "trade secret" as the totality of Kia's timing system.  (Dkt. No. 110 at 27; see also Compl. ¶ 59 ("Simms's actions as set forth above constitute conversion of proprietary information and trade secrets provided to Simms by Kia.").)  Pursuant to Thola, this court find the conversion claim is preempted because it is not factually independent of the WUTSA claim.  140 Wn. App. at 82.  Plaintiffs' claim for conversion fails as a matter of law.

VI. Washington Securities Act

Finally, Plaintiffs are entitled to summary judgment on Defendants' securities claim. RCW 21.20.005(12)(a) defines the term "security" as including:

> any note; stock; treasury stock; bond; debenture; evidence of indebtedness; certificate of interest or participation in any profit-sharing agreement; collateral-trust certificate; preorganization certificate or subscription; transferable share; investment contract; investment of money or other consideration in the risk capital of a venture with the expectation of some valuable benefit to the investor where the investor does not receive the right to exercise practical and actual control over the managerial decisions of the venture…

1  Washington courts apply a modified <u>Howey</u> test and define a security as "(1) an investment

2  of money (2) in a common enterprise and (3) the efforts of the promoter or a third party must

3  have been fundamentally significant ones that affected the investment's success or failure."

4  <u>Ito Int'l Corp. v. Prescott, Inc.</u>, 83 Wn. App. 282, 291 (1996) (citing <u>S.E.C. v. W.J. Howey</u>

5  <u>Co.</u>, 328 U.S. 293, 298-99 (1946)); <u>see also</u> <u>Cellular Engineering, Ltd. v. O'Neill</u>, 118 Wn.2d

6  116, 25-26 (1991).  Though limited partnership interests are generally considered securities,

7  the protections only apply when there is passive investment.  <u>State v. Argo</u>, 81 Wn. App.

8  552, 564-65 (1996) (citations omitted).  Where parties have negotiated the investment at

9  issue (instead of merely negotiating the quantity of money exchanged), Washington courts

10  have found "investors do not need the protections of the securities laws."  <u>Id.</u> at 565.

11      Defendants insist the claim should not be dismissed because Simms' capital

12  contribution was either (1) an investment contract or (2) a risk capital investment.  (Dkt. No.

13  127 at 30.)  Neither argument is persuasive.  The third prong of the <u>Howey</u> test, which

14  analyzes whether investment contracts are securities, looks to whether the profits on an

15  enterprise "come primarily or substantially from the efforts of others."  <u>Cellular Engineering</u>,

16  118 Wn.2d at 26.  Likewise, a risk capital investment may arise "where the investor does not

17  receive the right to exercise practical and actual control over the managerial decisions of the

18  venture."  RCW 21.20.005(12)(a).  Here, Simms's own description of the investment

19  precludes a finding that the investment was a security.   Simms explains he "agreed to

20  provide limited funding to Kia and Ultimate Timing to commercialize the system and to help

21  market the timing system in exchange for a 20% ownership and profit interest in Ultimate

22  Timing."  (Simms Decl. ¶ 5.)  He concedes he made efforts to ensure the success of the

23  enterprise: "I spent substantial time and effort marketing the timing system to race directors

24  and race timers during the time I was working with Kia and Ultimate Timing."  (<u>Id.</u> ¶ 8.)

25  Simms negotiated with Tacit on Ultimate Timing's behalf.  (Baum Decl., Ex. 4 (Simms

26  Dep.) at 222:02-223:05.)   Thus, Simms' own statements indicate he had actual control over

1  certain managerial decisions and made substantial efforts to ensure the venture became

2  profitable.  Simms' contribution, which he agreed to provide at the conclusion of face to face

3  negotiations, was not the type of passive investment that falls within the ambit of a security.

4      Plaintiffs are entitled to summary judgment on Defendants' claim for violation of

5  Washington's Securities Act and the claim is dismissed.

6      VII.    Other Damages

7      Defendants' motion also asks the Court to rule Plaintiffs are not entitled to recover

8  damages on behalf of Event Buddy, GreenLayer, and Final Timing because the action is not

9  brought on their behalf.  (Dkt. No. 115 at 27.)  Plaintiffs agree that Kia and Ultimate Timing

10  "each only seek to recover their own respective damages" and not those of the non-parties.

11  (Dkt. No. 122 at 26.)  Defendants also argue Kia is not entitled to recover damages due to

12  Ultimate Timing.  (Dkt. No. 115 at 28-29.)  Kia recognizes this statement "is both self-

13  evident and irrelevant" because "Ultimate Timing is aloes a plaintiff and damages are sought

14  by each of them."  (Dkt. No. 122 at 26-27.)

15      Defendants abandon both these argument in their reply and the issues do not appear

16  to be in dispute.  (See Dkt. No. 137 at 9-14.)

17      VIII.    Sealed Record

18      In its previous rulings sealing certain documents submitted in support of these

19  underlying motions, the Court indicated it may revisit the issue of sealing once it ruled on the

20  cross-motions for partial summary judgment.  (See Dkt. No. 151 at 3.)  Because the Court

21  has now found the publication of Plaintiffs' patent applications preclude trade secret

22  protection after July 23, 2009, the rationale for preserving the documents under seal no

23  longer exists.  Unless Plaintiffs file a renewed motion to seal, within seven days of this

24  Order, the Court shall unseal the remainder of the record.

25      \\

26      \\

1

**Conclusion**

2        Material issues of fact preclude summary judgment on a number of claims.  Neither

3   party is entitled to summary judgment on (1) Plaintiffs' claim for breach of the oral joint

4   venture agreement, (2) Plaintiffs' claim for breach of the written nondisclosure agreement, or

5   (3) Plaintiffs' claim for misappropriation of trade secrets.  The Court does find that, as a

6   matter of law, Plaintiffs forfeited their trade secrets protection after the publication of Kia's

7   patent application on July 23, 2009.  Plaintiffs' claim for conversion fails as a matter of law

8   because the WUTSA displaces the common law tort based on the same factual allegations.

9   Defendants' securities counterclaim is dismissed because the investment at issue is not a

10  security.  Both cross-motions are therefore DENIED IN PART and GRANTED IN PART.  If

11  Defendants wish to preserve any part of the record under seal, they must file a motion to seal

12  within seven (7) days of this Order.  The Clerk shall transmit copies of this Order to all

13  counsel of record.

14        Dated this 27th day of May, 2010.

15

16

17   Marsha J. Pechman
     United States District Judge

18

19

20

21

22

23

24

25

26